Good morning, Your Honors. If it may please the Court, Christian Garris on behalf of Appellant Susan Salyers. This is an ERISA case involving life insurance, group life insurance, life insurance that was paid for. The person insured sadly passed away in January 2014 and MetLife refused to pay the claim. Their justification is that evidence of insurability was not provided to them. They accepted premiums. The employer thought that $250,000 of life insurance had been purchased. That was the amount that was charged in premiums. And indeed, one of the person thought they had $250,000 in insurance. They paid for it. That's the amount that they should receive. MetLife ultimately decided not to pay the claim. They paid a minimal amount, $30,000, so there's $220,000 in issue. And this issue has not been decided by the What's the issue again? Frame it the way you think that the issue has not been decided. The issue that has not been decided is... Is can an insurance company under ERISA accept premiums for a certain level of coverage and then after some period of time, if there's a death, can they avoid payment? So that's an estoppel theory? Yes. It's estoppel and waiver. There's two issues here. It's waiver because they accepted premiums. This would be different if no premiums had been accepted. Then the insured would be led to believe, well, I'm not... I thought estoppel in the ERISA context required some sort of affirmative misrepresentation. So the misrepresentation here is the deduction of the premium amount for $250,000. Did she ever get a statement saying you were covered for $250,000? Yes. That would be the erroneous statement. The problem is that it didn't come from MetLife. The statement came from the employer. There's also a statement in the form of premium deduction, which is in the payroll checks. But that also came from the employer. Now, I don't know that... So that just leads to that there may have been an... There was an affirmative misrepresentation. It didn't come directly from the insurer. And the question is, is it attributable to the insurer? Yes. Those are two separate questions, of course, because... Let me ask you a question. We'll answer. Oh, thank you, Your Honor. The issue as to how the amount of coverage is to be communicated to the insured is one issue there. And here, the procedure seemed quite clear. The employer was designated by MetLife as the one to tell the insureds how much coverage they had. And in their paycheck, it sets out dependent life insurance was a separate line item. It wasn't bundled into a set of benefits that was deducted. But also the employer was the designated person who was supposed to collect evidence of a insurability-slash-statement-of-health or something and forward it to MetLife, which made the ultimate decision. So in that sense, they were sort of a clerical agent. They were supposed to get a piece of paper and send it to MetLife. We don't know if they were. There is nothing in the record that suggests what the procedure was supposed to be. Well, we know that from what they say is that you can't... I mean, I think this helps you, but the point is that it does say that only MetLife can approve the statement of whatever this thing is, which we've never seen. And it can... And until it does, you don't get the higher amount of insurance. Well, there's two things. There's a statement of health and there's evidence of insurability. Well, at some points, they say they're the same, with parentheses. At other points, they say may. At other points, they say evidence of insurability and don't say statement of health. That's why the Eighth Circuit found this plan to be ambiguous on this issue. It's the same plan? It's not the same plan, but it... Because it's a different employer, so it's not the same policy number, but the language is functionally identical. Yes. Jerry, Jennifer actually had a question for you. There was a close relationship between Providence and metropolitan life. And the metropolitan life... Excuse me. Providence was running this ERISA plan. Is that right? It appears that they were the ones providing... Were they or weren't they? It appears that they were, other than the payment of benefits. Okay. All right. And now, this thing has a kind of an interesting background. There And that was coverage. And then, another year, probably the next year, there was a $250,000 item. This is all what the hospital is doing. And then, the hospital... Was there more to this ERISA plan than life insurance? Yes, Your Honor. There was a whole... It was a full-blown ERISA plan? Yes. Yes. Okay. And it was administered by the hospital? I wouldn't say it was exclusively administered by the hospital, because MetLife did collect the premiums. They did issue the coverage. I would say they were jointly administering the plan. Well, if you... Can I ask one question? Just answer the question I asked of you, if you don't mind. Now... And then, it was the hospital that would turn the money over to Metropolitan Life. Yes. And... Now... Metropolitan Life certainly relied on the hospital. Yes, they could have administered the plan without them. They relied on the hospital. Yes. And they... And Metropolitan Life... What I understand, that administering this plan, particularly on life insurance, the hospital would transfer money over to Metropolitan Life, and give Metropolitan Life periodic reports. As to the periodic reporting, I don't know. There's nothing about that in the record. There's statements in briefs, but there's nothing, there's no proof or evidence of that. I am... How did Metropolitan Life find out what this... How did they find out what the status... We don't know. The only thing that's in the record is the employer's statement in their electronic files that $250,000 of coverage had been purchased and paid for, and that presumably was transmitted to the claims department once a claim came in. It's just supposition because there's no other documents. We even have something in the record where a Metropolitan Life officer, when the request from the hospital was made, that Metropolitan Life ought to pay the $250,000, then someone at Metropolitan Life recommended Metropolitan Life that they should pay it. Yes. And... So why aren't the two of them together? They're working back and forth on this. They're kind of relying on each other. Yes. Yeah. Why shouldn't they be treated as a unit, as one? It's the plan as a unit. I wouldn't disagree with that, Your Honor. And I think under this Sear case from the Ninth Circuit, CYR, a plan participant or beneficiary can sue the plan as an entity, or they can sue the insurer as long as it's not self-funded. So I think procedurally we're fine as having that liability. And Metropolitan Life was relying on the hospital to see that these status of health reports, or whatever they're called, were filled out. I don't know. By the employee. Judge Boulton had a question for you. Yes, Your Honor. A couple. Well... One is, and this is sort of off the wall, but... So why shouldn't they be treated as one unit? Because they were both together fulfilling all the functions as the plan administrator. The other... I mean, it seems to me there was another bigger problem here, which was that the plan says that she can't get more insurance for her husband than she did for herself. And she never got $250,000 or $500,000 for herself, right? It's unclear. The 2013 request appears to state that they're both getting $500,000 in coverage. Well, the request never said $500,000, right? It said $20,000. Yes. And $500,000 was issued and incidentally paid for. And you don't know whether it was for both or for one? I believe it was for both. She paid for both. And for the $250,000, I thought the record was that she went back to the $20,000, no? So in the fall of that same year, in 2013, the elections were made for the calendar year of 2014. That document has not been produced by MetLife. All we have are the results of that document that are in the claim file, which states that the amount was reduced from $500,000 to $250,000. I see. I don't know if it was just her or for both of them. I think it was for both. I see. And what about another question, was the 2013 fall sign-up, was that an initial sign-up because she had just begun working there? That was not the initial sign-up. The initial sign-up was August 5th of 2013. That's what I mean, but that was the initial sign-up, where they screwed up the $500,000. Yes. And that was when they first purchased this coverage, although she had been working there previously. I see. And she filled out a form that did have age, that sort of thing, and it says in that form, this is the August 2013 form, it says that evidence of insurability may be required. That's on the form? That is on the form. Is that in the record? Yes. Yes. The 2013 form is in the record. And the summary plan description says several different things. The points it says may are the points it says must and so on. It does definitely say must in several places. It says may in others, and it says nothing in other places. Now, there is the sort of sub-issue here that that plan was never provided to the insured prior to the claim, but in any event, it does say in the sign-up sheet that was completed in August of 2013, it does say evidence of insurability may be required. And the Gaines and Silva case both say that puts the burden then on MetLife to ensure that that information is requested from the insured because they might think, well, I filled out the age of the person and I proved that they were my spouse and I have now satisfied the elements required for insurability under this plan. I think that's exactly what occurred here. There's no evidence that Gary Walke, the decedent, would not have qualified this coverage if he had filled out a form that I could only imagine what the questions are. Again, that leads to one of the – Do we have any idea what that form would have consisted of or what questions it asked? No. There's no form in the record. I've never seen it personally. Was there a discovery for the question? We asked for all of the documents relating to the claim, and that form was not produced by MetLife. They had the opportunity to produce it and did not do so. And the impossibility that creates is what is the insured supposed to provide? Are they supposed to provide blood pressure? It creates a situation where the insured is put into the position of becoming an underwriter for a life insurance company, something that they're not qualified to do. They wouldn't know what the important questions are. I think if this form had been sent to the insured and the insured had failed to fill it out, that would be a totally different case. But here, nothing was requested of the insured. The premiums were paid. Any reasonable person would think that they have insurance. Do we know who was supposed to send the form to her? No. That's not in the record. Was it Providence or MetLife? One can guess, but there's nothing in the summary plan description or in the claim file or the essentially nonexistent underwriting file that explains how that procedure is supposed to occur. Getting back to the original when you said the critical issue that the Ninth Circuit hadn't decided, does that turn on agency law? I don't think so because the question here is once the insurance company gets premiums and they can see that they received the money, it's their own. Why are you uncomfortable with the agency issue? I understand there's the Supreme Court case that says that California, a certain rule in California is preempted, but there has to be federal agency law that underpins ERISA because everybody operates through agents. And the notion that there's no federal common law of agency that applies to ERISA is ridiculous. Obviously it does. Of course. Therefore, I don't understand why, and it also seems to me that as one of the district court cases said, that if MetLife is saying we're going to individually approve these forms, which they do, or the plan says that, then they have to get to them somehow. And it appears, I mean, I don't know why you're running away from this either. I don't know who other than the plan administrator would produce this piece of paper and have it filled out. So for that purpose at least, if for no other purpose, it would appear they have to be agents. I agree completely that in this instance, the facts of this case are clear that Providence is acting as MetLife's agent. They're taking premiums that they are then submitting to MetLife. That's an act of an agent. They're collecting who is insured under the plan and who isn't and how much. And that all seems something like an agent. You know, there's a district court. Somebody has to be doing it. Exactly. So if Lesser is a district court case Judge Liu came up with a few years ago. Right, that's the one you're talking about. And that case, MetLife argued, well, we've compartmentalized all this with all these different entities and third-party administrators, so we can't be responsible for anything. And the court rejected that, saying, well, you can't accept premiums and then say, well, there's some other entity involved here, so I'm off the hook and I don't have any responsibility. They have the responsibility, if they want this information, to request it from the insured. Okay, why don't you say something. I'll give you a minute for everybody. You've gone over your time. Thank you. Let's hear from MetLife. Good morning, Your Honors. May it please the Court, Ian Linker on behalf of Metropolitan Life Insurance Company. Ms. Salyers asserts a claim for ERISA plan benefits under 29 U.S.C. 1132a1b. This is not a claim for appropriate equitable relief under 29 U.S.C. 1132a3. The district court's findings of fact are reviewed by Your Honors. Could the equitable relief be whatever that term is? I mean, could she get equitable relief essentially of paying the money? I mean, what difference does what you just said make? Well, it makes a big difference, Your Honor, because the law is clear that under the doctrines of estoppel and waiver, when a claimant such as Ms. Salyers is looking for plan benefits, she's not entitled to those benefits unless very specific requirements are satisfied, and she has not done so here. So that's one thing. And the district court's findings of fact are reviewed for clear error, and the court made several significant findings. But who called that? Who called that to her attention? Who called what to her attention? The requirements she had to fill out. Oh, in the statement of health form, Your Honor, was specified in the plan document. It says very clearly that for dependent life insurance coverage, which is — No, it doesn't say it very clearly. It says a hundred different things. It says on the form, met life may require evidence of insurability depending on your election. In the SPD, it says — sometimes it says may, sometimes it says nothing, sometimes it says it's required. It says several different things. Because it's not required for all benefits. No. It's required for certain benefits. Even with regard to this benefit, it says several different things. I understand. Right. It is required when the claimant, the participant, or the dependent is seeking more than $50,000 in coverage. If the individual is seeking — All right. Be very specific, then. Sure. The first time it mentions this in the summary plan description, around page 18 or so, it says — let's see. First, it says on page 16, if you elect coverage for your spouse, domestic partner, you can receive at least $10,000 of coverage. You can choose coverage in increments. Coverage is limited to the lesser of a hundred percent or $500,000. And with respect to the — right above there, there's a paragraph about the employee coverage, and it says that coverage over $500,000 requires the approval of a statement of health application. But under domestic partner, it doesn't say that. Then you get to annual enrollments. If you add a dependent who could have been covered, it's subject to evidence of the dependent's good health. But in this instance, she actually didn't add it. As I understand it, it was the first coverage that we're talking about, and then it was reduced. So I don't — that doesn't seem to be applicable. Am I right about that so far? That she had attempted to reduce the mistaken — That she was not dealing with a situation where she first covered her husband later than the first opportunity. She first covered him at the first opportunity. As I understand it, that's correct. Right. So therefore, the paragraph I just read you doesn't apply because that only applied when you're trying to add somebody later. So then you get to page 139, and we're talking about the — your dependent life insurance, and that says eligibility of insurability is required for any amount elected over $50,000, but it doesn't say what eligibility of insurability is. Well, it does on the next page, Your Honor. I'm sorry, what? On the next page of the — I know. I know. But I'm trying to show you that it says 100 different things. Well, but — Four or three. Your Honor. All right. Then on the next page, it says that you can't — you have to have coverage of 150 — without evidence of insurability, parentheses, statement of health. Evidence of insurability is required for any amount. So the only time, as far as I can tell, that it says that it makes — it says that statement of health means — evidence of insurability means statement of health, and that you have to do it as opposed to you may do it is at that — Right. And, Your Honor, this is the section of the plan for the relevant coverage. This is — we're talking about dependent life insurance coverage. In the section of the plan — I know. That's the second paragraph. This is where — Everything else I read was specifically about dependent health insurance. Right. But in — the references to may be required that are in the plan are for all the coverages. It's not — it's not required for all of the coverages. It's required for some. So it may be required in certain circumstances. It may be required when someone seeks more than $50,000 of dependent life — excuse me, it must be required in a situation where a claimant seeks more than $50,000 in coverage, and it must be required in certain circumstances when an individual attempts to increase it above a certain amount. Counsel mentioned the Eighth Circuit's decision in Silva. The court there was looking at a completely different plan. There was no evidence of insurability mentioned next to statement of health. The statement of health wording was absent in the Silva plan. That's, in fact, what the Silva court said it would have needed to see in order to find that there was no ambiguity in the plan at issue there. And we have that language here. We have that parenthetical after evidence of insurability that they're one and the same. What does that mean? What's a statement of health? It's a — What does it mean? It's a statement that the plan administrator and plan sponsor — Where does one get a statement of health? Well, the — Does she have to come up with it herself? No, no, no. The district court found that Providence, the employer, was responsible for providing these statements to its — And that was not on behalf of MetLife, even though it was going to be forwarded to MetLife, who was going to approve it. That is correct. It was not on behalf of MetLife. MetLife — Now, that seems to me to be your hardest argument. That can't be. This is not MetLife's plan, Your Honor. It's Providence's plan. I know, but it's MetLife's insurance, and they're the ones that are requiring the statement of health and are going to approve it. I understand. MetLife funded — funds the plan. MetLife makes eligibility determinations. But on this particular issue, on this particular issue — Right. — MetLife is setting the requirement and is individually approving them, unlike everything else where it's not making individual decisions. It is individually approving this. Is that right? When a claimant who is required to submit evidence of insurability, the district court found that Providence is required to supply those forms to its claimants, to its participants — For its own health? I mean, why isn't it doing it? Because MetLife requires it. No, this is Providence's plan, Your Honor. MetLife does not require the — Okay, but is it not MetLife who is individually approving these statements of health? When it receives a statement of health, if it, after underwriting — Just out of the blue, a sub-statement of health arrives. I'm not — I mean, I don't understand how this is not being done on behalf of metropolitan life as a condition of coverage by metropolitan life. Because Providence, as the plan sponsor and executives of Providence — So you would accept anything? I'm sorry? Anything labeled a statement of health? We would accept anything as a statement of health? Yeah, right. If Providence, as the plan sponsor, started submitting handwritten forms that said statement of health on top, and this was something that was worked out — And it said, I am healthy, and gave it to MetLife, then what? Well, it would have to be on a form approved by MetLife, because — Well, there you go. I understand. There you go. MetLife is ultimately approving the form. MetLife does the underwriting, because it is Providence's plan. It's not MetLife's benefit plan here. Providence established and maintained this plan for the benefit of its employees. Look, it's MetLife that made the decision not to pay. But they all work together when they're setting this up. Isn't that true? It's still Providence's plan, Your Honor. I understand your point. I didn't ask you that question. They work together. You know, Metropolitan is a huge, huge insurance company. Yes, Your Honor. And I shouldn't tell you this, but I will. But when I was born, my father wanted to provide for my college education. And so he took out a Metropolitan life insurance policy on me. And for $250, that was it. And when I got to UCLA, when the policy was ready to pay off, that's what I got. And, well, tuition there was $25 a semester. So I could have made that. So I'm not complaining. I'm just telling you. I appreciate that, Your Honor. MetLife has been issuing policies like the one you described for a long, long time, almost 150 years. It's a very reputable and prestigious company. It also issues group policies. Well, why don't they pay her the $250,000? I understand, Your Honor. Because under the terms of the contract, she did not submit a statement of health form, as is required for her. But Metropolitan Life is relying on the hospital. But the hospital is not the agent of MetLife. The hospital has very certain. They may be. They may be. They're working together. They negotiated certain things together, but ultimately this was Providence's plan. But they're in effect, I think, maybe agents of each other. Well, but they're not. They have very specific functions under ERISA that they were carrying out here. I'm not convinced of that. There was discovery here, and the statement of health form has never been seen. There was no discovery, Your Honor. Because, as I said earlier, this is a claim for benefits under 1132A1B. So you're relying on the administrative record. We rely on the administrative record. As you know, no evidence of insurability statement of health was submitted here, so it wouldn't be in the administrative record. And below, the plaintiff didn't request a statement. But the agency question would be outside the administrative record. You would think it would be litigated. I mean, there is provision under ERISA to supplement the record for things that would not appear in the administrative record. For example, when you're trying to demonstrate what the standard review is based on abuse of discretion, you supplement the record. I would think you would supplement it on the agency question as well. Has anybody tried to do that here? There was no discovery below on those questions, Your Honor. So the plaintiffs haven't tried to do discovery. As far as I know, Your Honor, they have not sought discovery on this question. Let me explain to you. It's your view that there is absolutely no agency relationship here whatsoever? Yes. That is my view. Then how does this whole system work? Well, so, Your Honor, in Ward, the Supreme Court was very clear about why it held that the Elfstrom rule, California's agency law, was preempted by ERISA. All right. That was a preemption case. I understand. It wasn't a case about Federal agency law. I understand. Can we just establish that there has to be some kind of Federal agency law with regard to ERISA? I mean, for example, if Mrs. So-and-so is the one who is approving something on behalf of the plan, we at least have to say that Mrs. So-and-so is the agent of the plan. You can't just have no agency rule. Well, okay. So if Mrs. So-and-so is working for the plan, she's an employee of the plan. All right. So there has to be Federal agency law here. You can't just say there's no Federal agency law. No. What I am saying, though, is that ERISA has very specific functions for different entities. Well, and so there's no automatic agency. We understand that. It's not my understanding of the Elfstrom rule, or whatever it was called, was that they said automatically the plan is the agent of the insurance company. The Supreme Court said we don't have any such. That's a preempted rule. Right. But this isn't an automatic or across-the-board question. The question is with regard to the specific decision, i.e., what has to be provided and giving the person a statement of health and then providing it to MetLife, how can they not be the agent? So Providence didn't have to set up its plan this way, but it did. And Providence is not named in this lawsuit. The district court found that it was But you just told us that if Providence decided that the statement of health was I am healthy, that MetLife wouldn't take that. So it's not under Providence. No, no, Your Honor. MetLife could have been the record-keeper of this plan, but it is not the record-keeper of this plan. Providence could have decided to have MetLife ensure that statements of You see, I'm not even focusing on the record-keeping. I'm focusing on this statement of health. Who was supposed to provide it? Providence. And how was it supposed to? And how was it supposed to? But on behalf of MetLife. No, Your Honor. It is the plan's sponsor. That just doesn't really make any sense. This is Providence's plan. Providence could have elected not to have a statement of health requirement. That would have been its option to do it. And you would have charged a higher premium. Well, I mean, that would have been a difference. To Providence. Yeah. Well, to, I mean, right. There would have been higher premiums. It's up to Providence that it should be up to Providence what the statement of health is. And you told us it isn't. It can't be. It specifically says that there's no insurance of these amounts until MetLife approves it. There are certain functions that Providence has determined should be delegated to MetLife, and this was one of them. The medical underwriting. You don't think MetLife was the one that insisted upon this? It's going to let Providence make the decision about how healthy they are? No. Again, MetLife will approve a statement of health form if it meets certain guidelines. But I'm not suggesting that Providence was tied to MetLife here. Providence had the ability to decide how it was going to set up its plan for its employees. And this is how the company set up its benefit plan. I understand Your Honor's concern about the agency issue, but the Supreme Court said in Ward that if we were to adopt, if you were to adopt state agency law into ERISA, it would have a market effect on plan administration. I'm not talking about adopting state agency law. I'm talking about applying ordinary common law agency as part of federal law. I understand. And there has to be a federal law of agency embedded in ERISA. There has to be. There isn't, Your Honor. There isn't? Of course there is. The statute is very clear about what the roles and responsibilities are for various plan fiduciaries, and the regulations are clear as well. So the plan administrator and plan sponsor, they have certain obligations and responsibilities. A claims fiduciary or claim administrator like MetLife was in this case also has certain responsibilities. If a claim administrator like MetLife is granted discretionary authority, it's done so by the plan administrator. If you were to find that an agency law type of arrangement applies here, you would be interfering with those very specific roles and functions that the statute has set forth. And that's why it's, I understand your concern, but it's just not part of the statute. I would say that if a plan is delegated the responsibility to collect a form and send it to MetLife, who will approve it, that it's not an agency relationship with MetLife. Well, I don't think statutes speak in the negative like that, Your Honor. But it doesn't say anywhere that the plan administrator is the agent of a claim administrator or an insurance company that issues the plan. It automatically is, but it can be depending on what the role is and specifically what it's doing. The statute doesn't say that the plan administrator is the agent of the claim administrator. Okay. So when there's a gap like that. He isn't necessarily the agent of the claim administrator. It depends what they're doing. Your Honor, the statute doesn't say that there is an agency relationship. So you would have to look to incorporate state agency law. No, you would look to federal common law. Well, that's what I'm saying. You'd have to incorporate it into the federal common law because it is not currently there. When there's a gap in ERISA, that would be the only time when you could incorporate it. No, you don't have to incorporate state law. There is federal common law under ERISA for various purposes. I understand it's disfavored, but it can't be disfavored in the agency context because there has to be an agency law in general. That's my example of an employee. It has to be the case. Are you going to go to state agency law to ask the question of whether Mrs. Jones, who is working for MetLife, is binding on MetLife or on the plan? No. I think, Your Honor, with respect, I'm not suggesting that state agency law would apply here. But I am also saying that agency law is not currently part of the federal common law under ERISA. And for you to do so, you would have to look to state law in order to do it. The Supreme Court says it would interfere with plan administration. Granted, it was a preemption context. But in order for you to incorporate state agency law into the federal common law, that is what you would have to do. No, go ahead. Did you finish with Judge Brezon's question? Yes, I did, Your Honor. Thank you. Well, I just want to make sure I understand your theory about this then. So it's that the hospital is operating independently. Yes. And MetLife is over here operating independently. Yes. And under this plan, this particular provision of the plan, which calls for a statement of health, your position is that the hospital had an independent sort of obligation under their own plan to collect this form? And then forward it on to MetLife? Is that correct? It is the claimant's obligation to submit those forms, the statements of health, to MetLife. It is Providence's responsibility, as the district court found in one of its findings of fact, that it would ensure that those who needed to submit evidence of insurability statements of health did so. It did not happen in this case because of that upfront keystroke error that was made when Ms. Salyers, who was requesting $20,000 independent life insurance, accidentally received a $500,000 coverage. And under your theory, even though there must be some contractual relationship between MetLife and the hospital, correct? There's a group policy of insurance. It's a contract. Yes. And there's no kind of agency relationship under that contract? None whatsoever. And that contract is not in the record? That is correct, Your Honor. And if it, let's suppose hypothetically that it's said, when it's not in the record, I mean, maybe what we need to do is remand for fact-finding on the agency question, because if it's said, for example, when requested by MetLife, Providence will collect these later statements of health and send it to MetLife, then what? I'm sorry, I'm not following. Suppose the group health policy or the contract between the plan and MetLife specifically stated that the plan was to give out statements of health, drafted and supplied by MetLife when it's required, and then sold them to MetLife. Would that make any difference if it said that? The findings, the administrative record has this, Your Honor. It is at page 298 in the excerpts of record where it talks about how Providence was responsible for making sure that evidence of insurability was provided when it was required under the plan. That is clear. Did the district court make findings of fact when this was just a review for abuse of discretion? It wasn't a review for abuse of discretion, Your Honor. It was a de novo review. The court conducted a de novo review and in a Rule 52 motion for judgment made findings of fact. Those facts are reviewed for clear error. Ms. Salyers has not identified how those are erroneous facts. Why, by the way, was it a de novo review? It was a de novo review as I understand it because discretionary clauses are not permitted in ERISA plans in California. It's news to me. What? I guess I'm going to have to take another. What did you just say? The last thing that I said? Yeah. So there is no discretionary authority granted to MetLife in this case because discretionary clauses are banned under state law in California. And so this court has found that in a fully insured ERISA plan, MetLife and other plan fiduciaries are subject to de novo review under California law. I thought it was because they are essentially self-dealing. You think there's a law in California that says you can't do that? I am saying that California has a state law that bans discretionary clauses. It may be right, but I've never heard it. The Supreme Court in Glenn did not hold that a claimed fiduciary loses its discretionary authority when there's a conflict of interest. I'd be interested in seeing a citation of that. For the California law? Okay. I certainly will certainly point that out. You're away. We've given you a very substantial amount of time. I appreciate that, Your Honor. Thank you. We have these gum pads. We have these gum pads. Yeah. If you had no one off the top of your head, the clerk will supply you with a piece of paper that you can fill out this citation for us. Okay. If not, then send us a post-argument letter. Your Honor, to address counsel's last point, that is one point in which we are in agreement. There is a California statute in the insurance code. I cannot remember the number. I think it's 10-1-10.3. Really? That's just fascinating. How does that apply to ERISA? It's because it's a law that regulates the business of insurance. So for non-self-funded plans, it prohibits discretionary clauses. That case has not come up to this Court yet. The district court has had several cases on it. I see. But it's not really in dispute. I thought, is MetLife the fiduciary here? Well. I thought his whole argument is it's not. Yeah, that's part of the problem. On the one hand, MetLife wants Providence to have all the responsibility, but it also wants to hold this where we make the final decision on this on insurability. So Providence here. Or the only decision, as I understand it. That's right. Providence decided that the person, Gary Wolk, was insurable. Well. It made the decision. Not really. I mean, it just seems to have forgotten about the whole thing. It said, well, we have whatever we need, and we think he has $250,000 in coverage. That's what Providence said. MetLife says, well, we have the final discretion to make that decision on insurability. But because of this agency relationship, they're relying apparently, although there's no record to prove this, they're relying upon the employer to gather this information for them. But you didn't try to litigate outside the administrative record the agency question at all. Well, I. Could you have? I'm not sure is the answer. I think they are obligated under the disclosures in the district court to provide all the information related not just to the claim but the summary plan description and any other documents consulted or that should have been consulted by any of the claims people in administering the claim. I think that's something that they should have just produced as part of their. How about the contract between MetLife and? That is customarily produced. It was not produced here. Now, interestingly, in this summary plan description, unlike many, there is no statement that the employer is not the agent of the insurance company. That is a clause you frequently do see in these plans. It's not present here. And that goes, importantly, to that Elfstrom rule, which has now been abandoned by Ward, which said regardless of what's in the plan, the employer is the agent of the insurance company. So now it's to a case-by-case basis. Are they acting as an agent using federal common law? And I think the answer is clear here that they are acting as the agent of the insurance company, at least for the point about collecting premiums and collecting information about insurers. They're the ones that gather all the forms, and they're supposed to transmit them to MetLife, who maintains this final arbiter of whether someone is insurable or not. And because they do that and they rely on another entity to collect that information for them, I would say that they're clearly acting, Providence here is clearly acting as the agent of MetLife. And the failure to provide the form results in a payment of benefits? I think that when an insured has not been asked any information and is being charged premiums, it creates an impossibility of that insured to rectify the situation. This could have gone on for years, and the insured would have never been the wiser. Now, finally, one last point, if I may be allowed, on the Silva case. That's the Eighth Circuit case, the only other circuit court that's dealt with this issue. That plan, MetLife plan, also required sometimes, and said may other times, evidence of insurability. So I would say... The difference is it didn't have the parentheses statement of health. It did not. I would say functionally they're equivalents in terms of what they require, both of which are being evidence. Now, the one thing that your client could have and perhaps should have done and didn't You say I never applied for $500,000. Why are you charging me for it? She did. She called MetLife and asked them why I'd rather have $250,000 in coverage or the employer. I've forgotten who she contacted, but it was ever the person that she contacted was the person she was supposed to contact under those circumstances. And that's why in the fall of 2013, when she made the election, she chose $250,000. Which was pretty soon after the... It was August of 2013 that she first made this election. It was only a few months later. That's true. Yes. Okay. Thank you, counsel. Thank you. Thank you both. Very interesting case. The matter is submitted at this time. And we're going to take a short 10-minute recess before we hear our next case, which is Compass Bank.
judges: Pregerson, Paez, Berzon